Brinkerhoff, C. J.
This is an information in the nature of a writ of quo warranto, filed in this court by the attorney-general for the purpose of testing and contesting the validity of certain extensive annexations of outlying territory and incorporated villages claimed by the city to have been made to it under the authority, and in accordance with the provisions of the act of the 16th of April, 1870, to prescribe the corporate limits of Cincinnati. 67 O. L. 141.
To enable the reader of this report of the case who shall desire to give it a critical examination to have before him the requisite data for so doing, I here set forth in full the information by the attorney-general, and the plea thereto' on the part of the city. They are as follows:
INFORMATION.
“ At the term of December, 1869, Francis B. Pond, attorney-general of the State of Ohio, who sues for the said State in this behalf, comes here before the judges of the supreme court of the said State, on the — day of-, one thousand eight hundred and seventy, at the term aforesaid, and for the said State of Ohio, gives the said court to understand and be informed, that the city of Cincinnati, for a long time, now last past, to wit: since May 16, 1870, continuously until now,, hath used, and now doth at Cincinnati, to wit: at the county aforesaid, use, without any lawful warrant, grant or charter,, the following liberty, privilege, and franchise, to-wit: that of apportioning into wards of said city, and extending her government and control over, as if lawfully part thereof, the following described premises and real estate, all being within the county of Hamilton in said State, and bounded as follows : *28 Commencing at the mouth of the Little Miami river; thence north-eastwardly along the east branch of said river to th.4 south line of section fifteen, town four, fractional range two; thence west with said south line of section fifteen, to the south-west corner of said section; thence north along the section line between sections fifteen and twenty-one and sections sixteen and twenty-two, to the south-east corner of section twenty-three; thence west with the section line between sections twenty-two and twenty-three, sections twenty-eight and twenty-nine, and sections thirty-four and thirty-five in town four, fractional range two, and the section line between sections four and five, sections ten and eleven ; thence north with the east line of section seventeen to the south-east corner of section eighteen; thence with the section line between sections seventeen and eighteen, sections twenty-three and twenty-four, sections twenty-nine and thirty, to the south-east corner of section thirty-six; thence south with the west line of section twenty-nine to the southwest corner thereof; thence by section line between sections thirty-four and thirty-five in town three, fractional range two, to the eastern boundary of Green township; thence south with the eastern boundary lines of Green and Delhi townships, to the north-east line of the incorporated village of Eiverside; thence south-west with said north-east line of the incorporated village of Eiverside to the Ohio river; and thence up the Ohio river to the place of beginning, excepting therefrom so much of said premises as upon said sixteenth day of May, 1870, constituted and composed the city of Cincinnati, which said territory, less said exception, is not, nor has at any time since said last-named day been, part of said city, nor within the government or control of said city, or its municipal authorities and officers for any purpose, except so far as the police court of said city is concerned; but is, and hath during said time, been within, and governed by the several incorporated villages of Columbia, Woodburn, Avondale, Clifton, Cumminsville and Eiverside, in said Hamilton county, in part, and in part, that is to say — about sixteen sections of 640 acres of land, each, is farm lands, and not in *29 corporated for municipal purposes, nor contiguous to, nor necessary for the uses of said city of Cincinnati; which said liberty, privilege and franchise, the said city of Cincinnati, during all said time, hath usurped, and now doth usurp upon the State of Ohio, to its great damage and prejudice.
“ Wherefore, the said attorney-general prays the advice and judgment of the said the supreme court of the State of Ohio, in the premises, and due process of law against the city of Cincinnati aforesaid, in this behalf, to be made to answer unto the State of Ohio, by what warrant she claims to have, use and enjoy the liberty, privilege and franchise aforesaid.
Francis B. Pond, Attorney-general.
Hoadly, Jackson <& Johnson, Sage dé Hinkle, of counsel.
PLEA.
“ And now, in the same term, the said defendant, the city of Cincinnati, comes, by Walker, Conner & Warrington, its attorneys, and having heard the information read, says, that under color of the premises contained in said information, it is greatly troubled, and this by no means justly; because protesting that the said information and the matters contained therein are not sufficient at law, and it is not obliged by the laws of the land to answer thereto, nevertheless, for plea, it says:
“ That the general assembly of the State of Ohio, on the 16th day of April, 1870, passed an act entitled ‘ An act to prescribe the corporate limits of the city of Cincinnati,’ by the first three sections of which it was enacted, as follows:
‘ Section 1. Be it enacted by the General Assembly of the State of Ohio, That the corporate limits of the city of Cincinnati shall be as follows: Commencing at the mouth of the Little Miami river; thence north-eastwardly along the east bank of said river to the south line of section 15, town 4, frac, range 2; thence west with said south line of section 15 to the south-west corner of said section 15; thence north along the section line between sections 15 and 21 and sections J 6 and 22, to the south-east corner of section 23: thence *30 west with the section line between sections 22 and 23, sections 28 and 29, and sections 34 and 35, in town 4, frac, range 2, and the section line between sections 4 and 5, sections 10 and 11; thence north with east line of section 17 to south-east corner of section 18; thence with section line between sections 17 and 18, sections 23 and 24, sections 29 and 30, to south-east corner of section 36 ; thence south with the west line of section 29 to south-west corner thereof; thence by section line between sections 34 and 35, in town 3, frac, range 2, to the eastern boundary line of Green township; thence south with the eastern boundary lines of Green and Delhi townships to the north-east line of the incorporated village of Eiverside; thence south-west with said north-east line of the incorporated village of Eiverside to the Ohio river; and thence up the Ohio river to the place of beginning : provided, that a majority of the qualified electors in the territory hereinbefore described, and without the corporate limits, and not forming a part of said city of Cincinnati at the date of the passage of this act, shall, at a special election to be held for that purpose, vote in favor of the annexation of said territory to such city; said election shall be held on the third Monday in May, a.d. 1870. The Commissioners of Hamilton shall give ten days’ public notice of said election in the daily papers in said city, and fix the place at which the same shall be held. Voters shall place upon their ballots ‘Annexation — Yes,’ or ‘Annexation — No;’ and a return of the same shall be made by the judges of the election at each voting place to the clerk of the court of common pleas, who shall declare the result of said election; and in case a majority of the votes cast shall be in favor of annexation, he shall file with the clerk of the common council of said city a certified statement of the vote cast; and thereupon it shall be the duty of the said common council to cause to be made two accurate plats of said city, with the territory proposed to be annexed, and file one in the office of the Secretary of State and the other in the office of the recorder of Hamilton county.
‘ Section 2. The jurisdiction of the city over the said territory *31 not within its present limits, shall extend only to the apportionment of the same into wards, until the next annual election of municipal officers, if the same shall occur within three months after the division into wards, and until that time said territory shall be governed as it is at present. New wards may be created out of the said territory, or the same may be annexed to existing wards : Provided, that the number of wards in said city shall not exceed twenty-five (25). If the next annual election for municipal officers shall not occur within three (3) months after such division of said territory into wards can be made, then the city council of said city may order a special election of members of council therein, giving at least twenty (20) days’ notice of the same, and the terms of the members then elected shall expire at the same time as if* they had been elected at the preceding annual election of municipal officers. As soon as members of council from said territory have been elected and qualified, then the jurisdiction of said city shall extend over said territory for all purposes.
“ Section 3. So soon as may be after the territory shall be annexed to said city, it shall be the duty of the city council of said city, by an ordinance passed for that purpose, to divide the territory so annexed into wards, or incorporate the same, or any part or parts thereof, into some of the' existing wards of said city, and to provide proper places for holding elections in any wards so created, and to appoint proper persons to act as judges of the first election in any such newly created wards. Such ordinance shall be published in two or more daily newspapers of general circulation in said city and territory at least ten days before the next annual election of municipal officers: Provided, said next annual election of municipal officers shall take place within three (3) months after such division into wards ; but if said annual election shall not take place within that time, then said ordinance shall be published at least twenty (20) days before the special election in such newly created wards, as provided for in section two of this act.
“ And the said city of Cincinnati further says, that the *32 commissioners of Hamilton county gave ten days’ notice of the holding of the election provided for in said act, in the daily papers in said city, and fixed the places at which the same should be held: and that at said places, on the third Monday in May, a.d. 1870, as provided in said act, an election was held in all the territory in said act described, not forming a part of the said city at the date of the passage of said act, at which election the voters cast ballots inscribed “Annexation — Yes,” and “ Annexation — No,” and that at said election a majority of the votes cast were in favor of annexation, and that the judges of election at each of the voting places so designated, returned to the clerk of the court of common pleas of Hamilton county a statement of the votes given at said election, and that the said clerk declared the result of the said election to be that a majority of the votes cast were in favor of annexation, and filed with the clerk of the common council of said city a certified statement of the vote cast, and that thereupon the said common council caused to be made two accurate plats of said city, with the territory proposed to be annexed, and filed one in the office of the secretary of State, June 14th, 1870, and the other in the office of the recorder of Hamilton county, June 13th, 1870; and that thereafter the said common council of the said city of Cincinnati did direct a committee to report to it a proper scheme for dividing the territory included in said act, into twenty-five wards, as provided in said above-recited act.
“ And the said city of Cincinnati has claimed, and does yet claim, to have, use and enjoy all the liberties and franchises in the said information mentioned, by virtue of the aforesaid act of said legislature, and the proceedings under the same above set forth; without this, that the said city of Cincinnati has usurped, or does usurp, the said liberties, privileges and franchises upon the State of Ohio, in manner and form as by the said information is above alleged against it: all of which said several matters and things it, the said city of Cincinnati, is ready to verify and prove as the court .shall award.
“Wherefore the said city of Cincinnati prays judgment, *33 and that the aforesaid liberties and franchises, in form afore said, claimed by it, may for the future be allowed to it, and that it may be dismissed and discharged by the court hereof.
“Walker Conner & Warrington,
“ Attorneys for defendant.”
By this plea it will be seen that the city relies upon the provisions of the statute above referred to, the leading provisions of which are embodied in the plea itself, and on its compliance with the provisions of that statute, as its warrant and authority for the annexations of outside territory to its former limits which it claims to have accomplished. To this plea the State replied, alleging certain matters of fact, and raising certain questions of law which, in the view we take of the case, it is not necessary for us to decide; and wishing not to cumber the case with the discussion of questions not necessary to its decision, I pass them over.
To the reply the city demurred; and by so doing raisec' the question as to the sufficiency, in law, of all the preceding pleadings in the case ; and as by her plea the city relies for her warrant on the provisions of the act referred to, the question as to the constitutional validity of that act is forced upon us.
The burden and the responsibility of deciding this question are things not to be desired. The task is in every way an unwelcome one. Yet we cannot avoid it without an abdication of official duty. In our deliberations on the question, we have throughout been fully aware of the rule that an act of the legislative body, passed in due form, is not to be held invalid by reason of its being supposed to be in contravention of the provisions of the constitution, in a merely doubtful case; and that, in such case, the doubt should turn the scale in favor of the validity of the enactment. This court has always acted, and still acts, on the well-settled rule that it is only in cases where a legislative enactment is dearly unwarranted by, or repugnant to, the constitution that it will be so declared; and this on the ground of the *34 presumption that the legislative majority which enacted the statute in question, did so after full and careful investigation, and in the full conviction that what they were doing was within the constitutional grant of legislative power. True, this presumption may not be a very satisfactory one: and, perhaps, sometimes members of the legislative department of the government, instead of examining for themselves whether proposed enactments are warranted by the constitution which they are sworn to support, ignore this duty, with a view to throw it over upon the judiciary in the first instance. If this be so, it is certainly greatly to be regretted; but the responsibility does not rest upon us; and we cannot change .our rule of adjudication. The presumption of legislative fidelity to the constitution and to official duty remains.
But to the question. And first — what are the provisions of the constitution of Ohio which are supposed to bear upon it ? They are the first, second, and sixth sections of the thirteenth article of the constitution; which are in the following words:
“ Sec. 1. The general assembly shall pass no special act, conferring corporate powers.”
“ Sec. 2. Corporations may be formed under general laws; but all such laws may, from time to time, be altered or repealed.”
“ Sec. 6. The general assembly shall provide for the organization of cities and incorporated villages by general laws, and restrict their power of taxation, assessment, borrowing money, contracting debts and loaning their credit, st> as to prevent the abuse of such power.”
In looking at these provisions of our constitution — and indeed, in looking over all the provisions of our constitution from beginning to end — it will be seen that they make no distinction, as respects legislative power in the creation of them, and in the conferring of powers upon them, between .any classes of corporations proper. They make no distinction between private corporations, such as railroad, manufacturing, or mining corporation^, or the like, and public municipal corporations, such as cities and villages. On the *35 contrary, and as if to preclude the hypothesis of any such distinction, the sixth section of the thirteenth article assumes the imperative form of expression, and declares that “ the general assembly shall provide for the organization of cities and incorporated villages by general laws.” In respect to corporations proper, whether private or municipal, the provisions of section one, article thirteenth, are all-comprehensive. “The general assembly shall pass no special act conferring corporate powers.” These provisions of the constitution are as imperative, as comprehensive and emphatic, as if the people, speaking through their constitution, had said: “ this bane and curse of our legislation as it existed under the latitudinarian provisions of the constitution of 1802, is, in future, utterly and absolutely prohibited. Henceforth the laws conferring corporate powers shall be general; affecting, or liable to’ affect, the interests of the constituency of every individual member of the general assembly; and so, by powerful motives, calling his attention to the effect of proposed enactments upon his own immediate constituency, as well as upon the people of other localities.” This is the policy and intent of the provisions of the constitution above quoted; and they are as clearly apparent as if they had been expressed in so many words. No one who has read the proceedings and debates of the convention which presented to the people of Ohio the framework of the constitution which the latter by their votes established and adopted, or is old enough to remember the apprehensions of evil consequences with which the conferring of corporate powers by special acts were regarded, can fail to see that it was one of the ends and aims of the constitutional convention, and of the people who adopted the framework of a constitution which that convention presented for their adoption or rejection, to cut up by the roots, at once and forever, all capacity of the general assembly to confer by special act any powers whatsoever upon any corporate body whatsoever.
At one time, indeed, an attempt was made to escape the effect of these constitutional restrictions on legislative power, on the theory that the phrase “ conferring corporate powers,” *36 meant simply the conferring of corporate existence — the creation of a corporation, so that if corporations were only created under general laws, the legislature might then proceed by special acts to confer upon existing corporations as many and as varied powers as it pleased. Such a construction would leave a door wide open for the re-introduction of all the evils of special legislation which these restrictions and mandatory provisions of the constitution were obviously designed to guard against and prevent. Accordingly such a construction was distinctly repudiated by this court in the carefully considered case of Atkinson v. The Marietta, &c., R. R. Co., 15 Ohio St. 21. In that case Eanney, J., delivering the opinion of the court, and referring to the first and second sections of the thirteenth article of the constitution above quoted, says: “ These provisions of the constitution are too explicit to admit of the least doubt that they were intended to disable the general assembly from either creating corporations, or conferring upon them corporate powers, by special acts of legislation. It was intended to correct an existing evil, and to inaugurate the policy of placing all corporations of the same kind upon a perfect equality as to all future grants of power; of making such law, applicable to all parts of the State, and thereby securing the vigilance and attention of its whole representation; and finally, of making all judicial constructions of their powers, or the restrictions imposed upon them, equally applicable to all corporations of the same class. We must give such a construction to the constitution as will preserve its leading objects intact.”
I think the following propositions to be impregnable:
1. The general assembly cannot, by a special act, create a corporation.
2. It cannot, by special act, confer additional powers upon corporations already existing.
3. In the purview of these propositions and of the constitutional provisions on which they are based, there is no distinction between private and municipal corporations.
Now for the application of these propositions to the case before us. The act of the general assembly under which *37 the corporate authorities of Cincinnati proceeded to make the annexations of outside territory which they claim to have made and consummated, is “ a special actP It does not purport to be otherwise. Its language is, “ Be it enacted by the general assembly of the State of Ohio, that the corporate limits of the city of Cincinnati shall be as follows: commencing at the mouth of the Little Miami river, thence north-eastwardly,” etc., etc. And now, but one question remains. Does this special act assume to confer upon the corporation of the city of Cincinnati additional corporate powers —powers which, as a municipal corporation, she did not previously possess? The answer is plain. It does assume to confer, on certain prescribed conditions, the power of municipal government, the power of police regulation, the power of judicial jurisdiction, and the powers of assessment and taxation, over a number of outlying suburban incorporated villages, and of other territory hitherto subjected to no jurisdiction except such as belongs to the township, county, and state organizations.
A majority of the court are of opinion that the act is clearly in contravention of the restrictive provisions of the constitution, and therefore of no binding force and validity.
And here I might properly stop ; yet, for the purpose of excluding a possible conclusion, I will, on my own individual responsibility, say one word more. It may be asked, Do we intend to include township and county organizations in the category with municipal and other corporations proper ? The question is not involved in the present case, and so is not properly before us; but if it were, I apprehend the answer to it would readily be found in the case of the Commissioners of Hamilton County v. Mighels, 7 Ohio St. 109, where it is held that a county is not properly a corporation, but that “it is at most but a local organization, which, for purposes of civil administration, is invested with a few functions characteristic of a corporate existence.”

Judgment of ouster..

Scott, Welch, and Day, JJ;, concurred.
White, J., did not concur.